IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MICHAEL F. WEAKS,                   )
                                    )
          Plaintiff,                )
                                    )
v.                                  )        1:09cv00580
                                    )
NORTH CAROLINA DEPARTMENT OF        )
TRANSPORTATION, "NCDOT"             )
DIVISION OF MOTOR VEHICLES, "NC     )
DMV" LICENSE AND THEFT BUREAU,      )
                                    )
          Defendants.               )


**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

     Plaintiff Michael F. Weaks ("Weaks") brings this action for declaratory and monetary relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), 42 U.S.C. § 1983, and 28 U.S.C. §§ 2201 and 2202, for alleged failure to promote and disparate treatment. (Doc. 1.) Before the court is the motion for summary judgment by Weaks' employer, Defendants North Carolina Department of Transportation ("NCDOT"), Division of Motor Vehicles ("DMV"), "NC DMV" License and Theft Bureau (collectively "Defendants"). (Doc. 19.) Weaks filed an opposition (Doc. 23) and Defendants replied (Doc. 28). For the reasons set forth herein, Defendants' motion will be granted.

**I.  BACKGROUND**

On motion for summary judgment, the court views the evidence in the light most favorable to Plaintiff Weaks as the nonmoving party.  Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

**A.  Weaks' Prior Employment**

Weaks is an African-American employed by Defendants since 1994, when he was hired to the position of DMV Enforcement Officer.  (Doc. 1, Complaint ("Cmplt.") ¶ VII; Doc. 7, Answer ¶ VII.)  His employment included patrolling state highways and enforcing traffic laws.  (Doc. 20-3, Ex. C (Michael Fitzgerald Weaks Application).)  Weaks joined the Weight Enforcement Section and "became the immediate supervisor for the new officers hired as well as the Field Training Officers."  He also joined the Drug Interdiction Team.  (Doc. 24, Weaks Decl. ¶ 3.)

In April 2003, Weaks was promoted to Emissions Inspector in District II (Cumberland County), where he set up stations in the Emissions Program, certified Emissions Technicians, and performed Over Audits as well as Covert Observations.  (Id.) Subsequently, Weaks transferred to the agency's Raleigh headquarters, where he "co-managed" Districts 1 through 8, "reviewed investigations," and handled correspondence received from the Governor and others.  During this period, Weaks spoke with legislators and consumers, explaining DMV's policy and

procedures as well as related North Carolina General Statutes. (Id. ¶¶ 3, 4.)

In 2006, Weaks was promoted to Emissions Law Enforcement Supervisor in Greensboro.  In that position, he supervised eleven employees and other field personnel.  (Id. ¶ 5.)  He also served as the statewide Manager/Emissions Coordinator for all districts for six months, trained DMV personnel who attended the Basic School on the Emissions Program, and supervised the DMV Safety/Emissions Unit Call Center.  He also continued to speak with legislators and consumers on a daily basis.  (Id. ¶ 6.)  At the direction of Deputy Director Debbie Brewer, Weaks also led the "E-Sticker" Emissions Program and worked with various agencies and companies to develop it.  He also wrote proposed legislation relating to the program and met with various legislative committees, lawmakers, the NCDOT Board, and the Motor Vehicle Committee.  (Id. ¶¶ 7, 8.)

### B.  Position of Assistant Director-Emissions

In September 2008, Weaks applied for a promotion to one of two positions: Assistant Director-Emissions in the License and Theft Bureau; and if unsuccessful, Law Enforcement Manager of Emissions.[1]  (See Doc. 20-3, Ex. C.)

---

[1]  The parties and documents use the phrase "Law Enforcement Manager" to refer both to the latter position, to which Weaks was promoted, as well as to the position for which Weaks was rejected in 2008 that is the subject of this lawsuit (Assistant Director-Emissions). Defendants explain, and Weaks does not dispute, that both positions

The Assistant Director-Emissions is responsible for the oversight and administration of DMV's Emissions Program. (Doc. 20-2, Norman Blake ("Blake") Aff. ¶¶ 3, 4.) The position is equivalent to the former rank of Major, two grades higher than Weaks' position at the time of selection.[2] (Doc. 20-2, Gardner Aff. ¶ 6.) The posting for the position stated the following duties:

Description of Work

This position is Asst Director & is responsible for the operations & investigative programs within the L & T [License and Theft] Bureau. Duties include the development, organization & administration of the safety/emissions program; advise & support the Director in the evaluation & development of the L & T Bureau, legislative proposals & internal policy procedures; develops & recommends for adoption enforcement strategies & methods; provide technical staff provisions & specialized for field operations, clerical staff & evaluate the performance of affected geographic districts & make the appropriate recommendations concerning the statewide enforcement of Chapter 20 & Rules & Regs specifically pertaining to the motor safety inspection maintenance emission program & the enforcement of Federal Clean [Air] Act; Plan, prepare & oversee budget for the inspection maintenance program.

---

are considered "Law Enforcement Manager" by Defendants' Human Resources office. (<u>See</u> Doc. 20-2, Joseph I. Gardner, Jr. ("Gardner") Aff. ¶ 5.)

[2] The parties use the terms Lieutenant, Captain and Major to reflect the relative seniority ranks of various positions, although these terms are no longer used. A Major is a higher rank than Captain which, in turn, is a higher rank than Lieutenant. (<u>E.g.</u>, Doc. 20 at 11; Doc. 20-2, Gardner Aff. ¶¶ 6, 7.) While the position of Assistant Director-Emissions is a "Major"-level position, Weaks' position at the time of his application in 2008 was a "Lieutenant"-level position. (Doc. 20 at 11; Doc. 20-2, Gardner Aff. ¶ 6.)

(Doc. 20-3, Ex. A (application procedure omitted); Doc. 25, Ex. A (same).)

In addition to the description of work, the posting for Assistant Director-Emissions stated:

Knowledge, Skills And Abilities

Management *prefers* knowledge &/or experience with a safety/emissions program. . . . Inform & clarify policies, procedures, statutes & goals internally & externally; plan & conduct meetings; analyze statistical data to allocate statewide resources; coordinate & manage statewide operations; manage assigned criminal, civil & admin investigations as delegated to specialty unit supervisors; develop & implement technical admin investigations as delegated to specialty unit supervisors; develop & implement technical solutions to maintain & enhance program success; ensure adequate training programs . . . .

(Doc. 20-3, Ex. A (emphasis added); Doc. 25, Ex. A (emphasis added).) The Knowledge, Skills and Abilities section also listed various investigatory and law enforcement skills and abilities associated with the position. (Id.)

William Tracy Keel ("Keel"), a Caucasian, also applied for the position. (Doc. 20-3, Ex. B (William Tracy Keel Application).) At the time of the application, Weaks concedes, Keel had been employed by Defendants longer, had more supervisory experience with Defendants, and was in a higher position (Keel was already a Captain; Weaks was a Lieutenant). (Doc. 20-3, Ex. D; see Doc. 20-2, Blake Aff. ¶ 7.) Keel began service as an Enforcement Officer in 1987 and subsequently

attained the position of Sergeant, where he supervised four employees. In 1991, he was promoted to Lieutenant in the Enforcement Section, where he supervised six employees.[3] (Doc. 20-2, Blake Aff. ¶ 12, Gardner Aff. ¶ 7; Doc. 20-3, Ex. B.) Beginning in June 1996, Keel became Captain of Motor Carrier Enforcement for DMV. In this position, he supervised the agency's Motor Carrier Weight Enforcement program and managed a $2.3 million dollar budget from the federal government. (Doc. 20-2, Blake Aff. ¶ 11; Doc. 20-3, Ex. B.)

In 1997, Keel became Supervisor/Captain (Manager) of the License and Theft Bureau's Training and Development Section. (Doc. 20-2, Blake Aff. ¶ 10, Keith King ("King") Aff. ¶ 5; Doc. 20-3, Ex. B.) That position required that he have "the ability to learn and interpret the State and Federal laws and regulations as they relate to the duties of DMV License and Theft Bureau Agents and to transfer this information in training of employees." (Doc. 28-1, Jack D. Coltrane ("Coltrane") Aff. ¶ 7; see Doc. 28-3, Ex. F ("Position Description Form: Law Enforcement Officer III – Training and Development").) Thus, Keel was charged with training personnel on North Carolina emissions laws and DMV's policies regarding the Motor Vehicle Safety Inspection and Exhaust Emissions Programs. (Doc. 28-1,

---

[3] Defendant's Memorandum of Law in support of the Motion for Summary Judgment incorrectly states the date as 2001, rather than 1991, as reflected in a supporting affidavit and Defendant's Exhibit B.

Coltrane Aff. ¶ 8.)   This required Keel to have a working
knowledge of the Emissions Program.  (Doc. 20-2, King Aff. ¶ 5.)
During this period, in 2000, Keel was certified by the North
Carolina Office of State Personnel as a Public Manager.  (Doc.
20-2, Blake Aff. ¶ 13; Doc. 20-3, Ex. B.)

In January 2006, Keel became District Supervisor of a
seven-county area.  The District Supervisor's responsibilities
and duties are extensive and are set forth in a 12-page document
that includes the following as to emissions:

> The District Supervisor, through the staff,
> administers the safety/emissions inspection program
> within the district. . . . Undercover investigations
> are conducted on stations that are deficient and to
> meet the Division of Air Quality (DAQ) requirements.
> The District Supervisor causes an investigation to be
> made . . . regarding the safety/emissions inspection
> program and reviews the resulting reports to determine
> if the field personnel have taken proper corrective
> actions.  The District Supervisor reviews and
> evaluates reports to ensure that all federal
> requirements for the emissions program are met.  These
> include overt inspections of all licensed emission
> mechanics on a yearly basis and covert investigations
> of all licensed emission stations semi[-]annually.
> The District Supervisor monitors and counsels local
> community colleges in conducting training schools for
> safety and emission inspection mechanics and station
> owners.

(Doc. 28-1, Coltrane Aff. ¶ 4; Doc. 28-2, Ex. E ("Position
Description Form: Law Enforcement Manager - District Field
Office").)  As District Supervisor, Keel was required to be
"totally familiar with all aspects of the Section's
responsibilities," which included management of operations

involving vehicle theft, title fraud, and various other types of fraud, as well as enforcement of the rules and regulations governing, among other things, vehicle safety and emissions inspection stations (which required knowledge of the Bureau's Emissions Program). (Doc. 20-2, Blake Aff. ¶ 9; Doc. 20-3, Ex. B; Doc. 28-2, Ex. E.) He supervised twenty-five employees, was required to have "a working knowledge of each position's duties and the ability and skill to provide this information and expertise to subordinates," and was ultimately "accountable for the success or failure" of all of the District's programs assigned to the License and Theft Bureau well beyond just emissions. (Doc. 20-3, Ex. B; Doc. 28-2, Ex. E.) For four months during this period, he also undertook responsibility for an adjoining District.[4] (Doc. 20-2, Blake Aff. ¶ 9; see Doc. 20-3, Ex. B.)

In February 2008, Keel became Supervisor (Captain) of the License and Theft Bureau's Fraud Unit, which identifies fraud with respect to drivers' licenses, vehicle titles, and registration. (Doc. 20-2, Blake Aff. ¶ 7; Doc. 20-3, Ex. B.) His duties included meeting with state and federal law enforcement agencies to combat fraud and incorporating that

---

[4] Defendants state that Keel managed District IV from June to September 2008, although this year appears to be a typographical error, as Keel was not a District Supervisor after February 2008. (See Doc. 20-3, Ex. B.)

information into the agency's operations. (Doc. 20-2, Blake Aff. ¶ 8.) In this position he supervised nine subordinates and managed the agency's Identity Lab. (Doc. 20-3, Ex. B.)

Thus, at the time of his application in 2008, Keel had been a sworn law enforcement officer for 27 years, had supervised other agency employees for 17 years, and had been the designated manager of entire programs or Districts for the agency for 12 years. For 12 years, he had been not only a Supervisor, but he had supervised other supervisors.

### C. Selection Process

Pursuant to published guidelines (Doc. 27, Ex. E), candidates for the position of Assistant Director-Emissions appeared before an interview committee (also referred to as an interview panel). The interview committee consisted of three members: (1) Norman Blake, an African-American Supervisor over the Greensboro District; (2) Greg Lockamy, a Caucasian who was Deputy Director of the License and Theft Bureau; and (3) Brian Bozard, a Caucasian who was the Director of the License and Theft Bureau. (Doc. 24, Weaks Decl. ¶ 16.) Each candidate was required to complete an application and answer a questionnaire, which the interview committee used for its deliberations. Personal interviews of each candidate were also conducted.

Defendants rated the applications of both Weaks and Keel as "Most Qualified." (Doc. 20-3, Exs. B, C.) "Most Qualified" is

defined as "the group of applicants who, to the greatest extent, possess qualifications which exceed the minimum requirements described in the vacancy announcement." (Doc. 27.) The consensus of the interview committee, without dissent, was to recommend Keel for the Assistant Director-Emissions position.[5] (Doc. 20-2, Blake Aff. ¶ 21.) Ultimately, Keel was promoted to the position (although neither Weaks nor Defendants indicates who made the decision).

Although Weaks was not selected for the position of Assistant Director-Emissions, in approximately October 2008 he was promoted to the other position he sought – Law Enforcement Manager of Emissions, a Captain's position. (Doc. 1, Cmplt. ¶ VII; Doc. 20-2, Blake Aff. ¶ 23, Gardner Aff. ¶¶ 3, 4.) This is equivalent to the rank Keel had held since 1996. (Doc. 20-2, Blake Aff. ¶ 23.)

On or about March 17, 2009, Weaks submitted a charge of racial discrimination to the Equal Employment Opportunity Commission. Defendants admit that a "notice of right to sue letter" was issued and that this lawsuit was brought timely. (Doc. 1, Cmplt. ¶ I(4); Doc. 7, Answer at 1 (admitted).)

---

[5]  Blake, who is African-American, states that to his knowledge the race of the applicants played no part in the selection process, including in his own decisionmaking. (Doc. 20-2, Blake Aff. ¶ 22.) However, the court will not consider at the summary judgment stage general assertions by the Defendants that they did not discriminate.

Weaks contends that Defendants discriminated against him by failing to promote him to the position of Assistant Director-Emissions in 2008. He also contends generally that since 2006 he was treated more harshly because of his race. The Complaint's sole count claims that Defendants are liable "for subjecting [Weaks] to race discrimination and disparate treatment due to race in the terms and conditions of his employment in violation of Title VII of the Civil Rights Act of 1964, and as amended in 1991 and 42 USC 1983." (Doc. 1, Cmplt. at 5.) He requests that the court declare the practices complained of unlawful and seeks a permanent injunction against Defendants for any conduct "shown to be in violation of applicable law." (Id.) He also seeks compensatory damages, including pecuniary loss, emotional pain, and mental suffering, as well as back pay and punitive damages. (Id. at 1, 5.)

## II. ANALYSIS

### A. Section 1983 Claims

Weaks seeks recovery pursuant to 42 U.S.C. § 1983 as well as under Title VII. (Doc. 1, Cmplt. ¶¶ I(2), V.) Defendants assert that they are not "persons" within the meaning of section 1983 (and section 1981) for purposes of recovering monetary

damages. (Doc. 7, Answer (First Defense).) Neither party has briefed the issue,[6] although the law is clear.

In <u>Will v. Michigan Department of State Police</u>, 491 U.S. 58, 71 (1989), the Supreme Court held that a state is not a "person" under section 1983. <u>Id.</u> The court also held that the Eleventh Amendment bars section 1983 suits unless the state has waived its immunity. <u>Id.</u> at 66-67. This state immunity extends to governmental entities that are considered "arms of the State" for Eleventh Amendment purposes. <u>Id.</u> at 70. Here, Defendants are arms of the State of North Carolina. <u>See</u> <u>Brown v. N.C. Div. of Motor Vehicles</u>, 166 F.3d 698, 705 (4th Cir. 1999) (noting that DMV, "as a department of the state, is immune from suit unless Congress has abrogated that immunity"); <u>Bennett v. N.C. Dep't of Transp.</u>, No. 1:05CV0764, 2007 WL 4208390, at *4 (M.D.N.C. Nov. 26, 2007) (dismissing section 1983 claims for racial discrimination and hostile work environment against NCDOT).

Weaks has not alleged that Defendants consented to suit.[7] Defendants are therefore immune from a direct action under

---

[6] Weaks' opposition brief references section 1983 in a heading and in the concluding paragraph of its discussion of the interview panel. (Doc. 23 at 5, 15.) In a footnote, Weaks states that claims under 42 U.S.C. § 1981 "are analyzed using the *McDonnell Douglas* standard." (<u>Id.</u> at 4 n.1) Section 1981 is not mentioned in Weaks' Complaint or in his opposition except for the footnote reference. Otherwise, Weaks' opposition addresses only the Title VII claim. (<u>See</u> <u>id.</u> at 5-8.)

section 1983 in this court regardless of the relief sought.[8]  See
Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) (state cannot
be sued in its own name regardless of the relief sought unless
it waives its Eleventh Amendment immunity or Congress has
overridden it).[9]

**B.    Summary Judgment Standard**

Summary judgment is appropriate where the pleadings,
affidavits, and other proper discovery materials demonstrate
that no genuine dispute as to any material fact exists and the
moving party is entitled to judgment as a matter of law.  Fed.
R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-33
(1986).  The party seeking summary judgment bears the burden of
initially demonstrating the absence of a genuine issue of
material fact.  Celotex, 477 U.S. at 323.  If this burden is
met, the nonmoving party must then affirmatively demonstrate a

---

[7]  The State Employee Federal Remedy Restoration Act waives sovereign
immunity, with limitations, with respect to certain actions that do
not include section 1983.  See N.C. Gen. Stat. § 143-300.35.

[8]  The Complaint does not name as defendant a state officer, either in
an official or individual capacity.  Thus, this action does not fall
under the exception announced by the Supreme Court in Ex Parte Young,
209 U.S. 123 (1908), which permits a federal court to issue
prospective injunctive relief against a state officer to prevent
ongoing violations of federal law.  See McBurney v. Cuccinelli, 616
F.3d 393, 399 (4th Cir. 2010).

[9]  In contrast, Weaks may bring an action against Defendants under
Title VII.  Fitzpatrick v. Bitzer, 427 U.S. 445, 456-57 (1976).
However, any claim against Defendants for punitive damages would be
barred.  See 42 U.S.C. § 1981a(b)(1) (barring Title VII recovery of
punitive damages from a government agency); Bennett, 2007 WL 4208390,
at *4 (same).

genuine issue of material fact which requires trial. <u>Matsushita</u> <u>Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

Federal Rule of Civil Procedure 56(e), in effect at the time of this motion and Weaks' opposition, required that "affidavits submitted by the party defending against a summary-judgment motion contain specific facts, admissible in evidence, from an affiant competent to testify, 'showing that there is a genuine issue for trial.'"[10]  <u>Pension Benefit Guar. Corp. v.</u> <u>Beverley</u>, 404 F.3d 243, 246-47 (4th Cir. 2005) (quoting 10B Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, <u>Federal</u> <u>Practice & Procedure</u> § 2740, at 399 (1998)).  There is no issue for trial unless sufficient evidence favoring the nonmoving party exists for a fact finder to return a verdict for that party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50, 257 (1986) (there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); <u>Sylvia Dev. Corp. v. Calvert Cnty.</u>, 48 F.3d 810, 817 (4th Cir. 1995).  Moreover, on summary judgment, the nonmoving party is entitled to have the "credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all

---

[10]  Rule 56(c)(4), effective December 1, 2010, continues to require that affidavits (or declarations) be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant (or declarant) is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4) (effective Dec. 1, 2010).

internal conflicts in it resolved favorably to him."
Metric/Kvaerner Fayetteville v. Fed. Ins. Co., 403 F.3d 188, 197
(4th Cir. 2005) (quoting Charbonnages de France v. Smith, 597
F.2d 406, 414 (4th Cir. 1979)).   "Where the record taken as a
whole could not lead a rational trier of fact to find for the
non-moving party, there is no 'genuine issue for trial.'"
Matsushita, 475 U.S. at 587.

   **C.   Weaks' Title VII Claims**

   Title VII makes it an unlawful employment practice for an
employer, including a state agency, "to . . . discriminate
against any individual with respect to his compensation, terms,
conditions, or privileges of employment, because of such
individual's race."   42 U.S.C. § 2000e-2(a)(1).   A Title VII
plaintiff in Weaks' position may survive a summary judgment
motion through one of two avenues of proof.   A plaintiff may
establish through direct or circumstantial evidence that race,
though not the sole reason, was a "motivating factor" in the
denial of a promotion.   Diamond v. Colonial Life & Accident Ins.
Co., 416 F.3d 310, 318 (4th Cir. 2005).   Alternatively, he or
she may use the burden-shifting proof scheme established by the
Supreme Court in McDonnell Douglas v. Green, 411 U.S. 792
(1973).   Diamond, 416 F.3d at 318.   Though acknowledging the
first avenue, Weaks' legal analysis in opposition to Defendants'
motion for summary judgment proceeds under the latter framework.

Under McDonnell Douglas, the plaintiff must first establish a *prima facie* case of discrimination, at which point the burden shifts to the defendant to articulate some "legitimate, non-discriminatory reason" for its action. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If the employer carries its burden of production, the presumption of discrimination raised by the *prima facie* case "drops out of the picture" and the ultimate burden remains with the employee to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not the true reasons, but were a pretext for discrimination." Id. at 142-43 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). To prevail, a plaintiff must ultimately prove he or she was treated less favorably than other applicants because of race. Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005); Carter v. Ball, 33 F.3d 450, 456 n.7 (4th Cir. 1994). To establish pretext, a plaintiff cannot focus on "minor discrepancies that do not cast doubt on the explanation's validity, or by raising points that are wholly irrelevant to it." Hux v. City of Newport News, 451 F.3d 311, 315-16 (4th Cir. 2006).

Weaks focuses his claim on his failure to be hired as Assistant Director-Emissions in 2008. He contends he was treated more harshly "than similarly situated white employees

under the same or similar circumstances," and that the interview committee was "impaneled improperly, relied on subjective criteria to form the basis of their recommendation, and ultimately discriminated against him due to his race." (Doc. 23 at 7-8.) He claims he was the most qualified person for the position and that Defendants, "rel[ying] heavily on subjective criteria," selected a less-qualified white male, Keel, for the position. (Doc. 1, Cmplt. ¶ IX; Doc. 23 at 9-10.)

### 1.   Proof of *Prima Facie* Case

To establish a *prima facie* case under McDonnell Douglas, the plaintiff must prove that he (1) is a member of a protected group, (2) applied for the position in question, (3) was qualified for the position, and (4) was rejected under circumstances giving rise to an inference of unlawful discrimination. Anderson, 406 F.3d at 268; Williams v. Giant Food Inc., 370 F.3d 423, 430 (4th Cir. 2004). "The burden to establish a *prima facie* case of disparate treatment is not onerous." Burdine, 450 U.S. at 253.

Here, Weaks, as an African-American, is a member of a protected group and applied for the Assistant Director-Emissions position at issue. Defendants further admit he was qualified

for the position.[11]   To satisfy the fourth prong, a plaintiff
need only show that the position was filled by a person not in
the protected class.   See, e.g., id. at 253 & n.6; Carter, 33
F.3d at 458.   The position was filled by Keel, a Caucasian.
Thus, Weaks has established a *prima facie* case of a
discriminatory refusal to promote.

### 2.   Defendants' Articulation of a Legitimate, Non-Discriminatory Reason

Under McDonnell Douglas, once a plaintiff establishes a
*prima facie* case, the burden shifts to the defendant to produce
a non-discriminatory explanation for the decision.   The burden
on Defendants at this stage is one of production, not
persuasion, and the court's analysis "can involve no credibility
assessment."   St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509
(1993).

Defendants proffer that Keel was selected for the position
of Assistant Director-Emissions because he was the better-
qualified candidate.   Noting that the position is responsible
for "the operations and investigative programs" within the
License and Theft Bureau, Defendants represent that the position
required "first and foremost a person with significant law
enforcement managerial experience and someone with a basic

---

[11]   Weaks also contends he received exceptional job performance
evaluations, which Defendants generally acknowledge.   (Doc. 7, Answer
¶ IX.)

knowledge of the Emissions program." (Doc. 20 at 3-4.) This is consistent with Defendants' posted description of work for the position. (Doc. 20-3, Ex. A; Doc. 25, Ex. A.)

Defendants point to Keel's extensive supervisory and managerial experience in diverse areas, comparing it to the limited supervisory experience of Weaks. Specifically, Defendants point to Keel's approximately 27 years as a sworn law enforcement officer and his supervisory work history of nearly eighteen years, a period longer than Weaks had been employed by Defendants. Defendants also point to Keel's experience since 1996,[12] which included being a manager, that is, one who supervises supervisors -- experience which Weaks did not have at the time of his application for the position of Assistant Director-Emissions. (See Doc. 20 at 7; Doc. 20-1, Blake Aff. ¶ 13.) Keel had managed seven counties and for four months assumed additional responsibility for nine other counties. Finally, Defendants note that Keel had eleven years' experience with emissions law and regulations as a District Supervisor and as Captain/Supervisor of the Training and Development Unit.

Defendants contrast Keel's experience with that of Weaks. At the time of his application, Weaks had formally supervised others for only two years, beginning with his promotion to

---

[12] Defendants briefing notes Keel being a Captain "since 1994" (e.g., Doc. 20 at 15) although the supporting documents make clear he became a Captain in 1996.

Lieutenant in 2006. Thus, he held for only two years the supervisory type of position Keel had held since 1991. While Weaks became a Captain in 2008, Keel had held that position for more than a decade. By Weaks' own admission, his position was subordinate to Keel's at the time of the application for Assistant Director-Emissions.[13] (Doc. 20-3, Ex. D.)

Based on the record, the court finds that Defendants have carried their burden of producing a legitimate, non-discriminatory reason for promoting Keel over Weaks. Because Defendants have met their burden of production, the burden of persuasion is upon Weaks to show pretext. See Anderson, 406 F.3d at 269 (requiring plaintiff to show employer's explanation that selected applicant was best candidate was a pretext for racial discrimination and citing Hicks, 509 U.S. at 511).

### 3. Pretext

Once an employer meets the burden of producing a legitimate, non-discriminatory reason, "the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143 (internal quotation marks omitted). The ultimate burden of

---

[13] Weaks reports he supervised 120 while employed as a Correctional Officer by the North Carolina Department of Corrections, but as Defendants point out, and Weaks does not dispute, those were not employees but were inmates. (Doc. 20 at 9 n.2; see Doc. 26, Ex. C.)

persuasion remains on the plaintiff at all times.  <u>Burdine</u>, 450

U.S. at 252-53.  The question, therefore, is whether Weaks has

presented or forecast evidence that Defendants' reason was not

the true reason, but was a pretext for discrimination,

sufficient to survive the summary judgment motion.  <u>See</u> <u>Reeves</u>,

530 U.S. at 143.

Prior to <u>Reeves</u>, the Fourth Circuit required that a

plaintiff claiming discrimination with respect to a denied

promotion establish that he or she was the better qualified

candidate for the position sought.  <u>Evans v. Techs. Applications</u>

<u>& Serv. Co.</u>, 80 F.3d 954, 960 (4th Cir. 1996).  In <u>Anderson v.</u>

<u>Westinghouse Savannah River Co.</u>, however, the Fourth Circuit

observed:

> We followed <u>Reeves</u> in <u>Dennis v. Columbia Colleton</u>
> <u>Medical Center, Inc.</u>, 290 F.3d 639, 648-49 & n.4 (4th
> Cir. 2002), and determined that a plaintiff in a
> failure to promote case is not necessarily required to
> meet the test in <u>Evans Technologies Applications &</u>
> <u>Service Co.</u>, 80 F.3d 954, 960 (4th Cir. 1996), that a
> plaintiff "must establish that she was the better
> qualified candidate for the position sought."
>
> . . . "<u>Reeves</u> plainly instructs us to apply a contrary
> approach [to <u>Evans</u>] by affirming that it is
> permissible for the trier of fact to infer the
> ultimate fact of discrimination from the falsity of
> the employer's explanation."

406 F.3d at 269 (citations omitted).  Thus, "[a] plaintiff

alleging a failure to promote can prove pretext by showing that

he was better qualified, or by amassing circumstantial evidence

that otherwise undermines the credibility of the employer's stated reasons."[14] <u>Heiko v. Colombo Savings Bank, F.S.B.</u>, 434 F.3d 249, 259 (4th Cir. 2006) (citing <u>Anderson</u>, 406 F.3d at 269); <u>Dennis v. Columbia Colleton Medical Center, Inc.</u>, 290 F.3d 639, 648-49 & n.4 (4th Cir. 2002).

The court, therefore, will address whether Weaks has forecast sufficient evidence for a jury to conclude that (1) he was the better qualified candidate or (2) Defendants' stated reason for promoting Keel over him was pretextual.

### a. Weaks as Better Qualified Applicant

Weaks asserts that he was the better qualified candidate for the position, based on his knowledge of and experience in emissions. (Doc. 23 at 9-10; Doc. 24, Weaks Decl. ¶ 12.) He argues that the interview committee "used ever-changing subjective criteria" to justify Keel's hiring. (Doc. 23 at 14.) He points to the interview and questions in which, he asserts, "a lot of emphasis was placed on supervisory experience; however, the job posting clearly indicated and stressed the importance of knowledge of emissions." (Doc. 24, Weaks Decl. ¶ 19.)

---

[14] There are exceptions, however, such as when the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or when the plaintiff creates only a weak issue of fact as to whether the employer's reason is untrue and there is abundant and uncontroverted independent evidence that no discrimination has occurred. <u>Reeves</u>, 530 U.S. at 148.

When a plaintiff relies on his qualifications to establish pretext, he must do more than show his qualifications were similar or only slightly superior to those of the person eventually selected. <u>Heiko</u>, 434 F.3d at 261-62 (finding that plaintiff provided sufficient evidence of possible pretext because plaintiff's qualifications were "demonstratively superior"). One way to prove a plaintiff's case under the theory that he is the better qualified candidate is to show that his qualifications were "so plainly superior that the employer could not have preferred another candidate."[15] <u>Dennis</u>, 290 F.3d at 648 n.4; <u>Hill v. Leavitt</u>, Case No. 1:05cv00582, 2007 WL 2815742, at *1, *5 (M.D.N.C. Sept. 24, 2007) (adopting Magistrate's recommendation, including finding that plaintiff failed to show he was "so plainly superior that the employer could not have preferred another candidate"); see <u>Ash v. Tyson Foods, Inc.</u>, 546 U.S. 454, 458 (2006) (declining to "define more precisely what standard should govern pretext claims based on superior qualifications"). Ultimately, it is not within the federal court's authority "to dictate the factors that employers

_____

[15]   "[A]n equally valid way to prove pretext is to provide evidence that the employer's proffered reason was not the actual reason relied on, but was rather a false description of its reasoning – albeit one based on a real difference in qualifications – manufactured after the fact." <u>Dennis</u>, 290 F.3d at 648 n.4.  Weaks has not articulated his argument as such.

must weigh in making a promotion" under Title VII.  Hux, 451
F.3d at 318.

In Diamond, supra, the court addressed an employee's claim
that the employer's "failure to 'recognize [her] prior
experience as management experience should be considered
evidence of discriminat[ory] intent,' and that this evidence
[was] sufficient to show that [the employer's] stated reasons
for not promoting her were a pretext for discrimination."  416
F.3d at 319 (third and fourth alterations added).  The court
disagreed, finding it was unable to conclude that the plaintiff
could show pretext even assuming she had more management
experience than the employee who was promoted.  The court noted
that according to the stated qualifications, some management
experience was "preferred," but such experience was not regarded
as essential.  "Thus, while management experience was a factor
to be considered in awarding the promotion, it clearly was not
intended to be dispositive."  Id.

Here, Weaks focuses on the following job posting criteria:

> Management prefers knowledge of &/or experience with a
> safety/emissions program; must have experience in
> developing & evaluating internal policies &
> procedures; respond daily to inq[uiries] . . . public,
> legislature, other state agencies, & judicial
> officials; inform & clarify policies, pro[cedures] . .
> . statutes & goals internally & externally.

(Doc. 23 at 9; see Doc. 20-3, Ex. A.)  He argues that "[t]hese
are precisely the skills held by the plaintiff."  (Doc. 23 at

9.)   He notes his promotion in 2006 to Law Enforcement Supervisor in Greensboro, where he supervised eleven employees as well as field personnel.  For six months, he also served as statewide Manager/Emission Coordinator for all districts, became Manager/Emissions Coordinator for the western part of the state, supervised the Safety/Emission Unit Call Center, handled correspondence with the Governor, Secretary of State, and Commission, spoke with legislators and consumers daily regarding statutory issues, worked with the state air quality divisions, and led the "E-Sticker" Emissions Program (including writing new program specifications and technical changes to legislation, and giving presentations to various groups).   (Doc. 23 at 9-10.) Weaks also received emissions training, was a certified emissions specialist, and held several emissions-specific licenses.[16]  (Doc. 24, Weaks Decl. ¶ 9.)

Weaks asserts baldly, without any explanation, that Keel had "absolutely no experience in Emissions."  (Doc. 23 at 9.) As noted earlier, however, the uncontested record demonstrates that Keel indeed had experience in emissions that appears to

---

[16]   Weaks' affidavit also references letters of recommendation he submitted as exhibits which are dated in February and March 2009, several months after his September 15, 2008, application.  He provides no evidence, however, that the letters were provided to the interview committee or decisionmaker filling the position of Assistant Director-Emissions.   To the extent they are relevant, see DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998), the letters indicate that Weaks was qualified for the position in question, a fact admitted by Defendants.

have been much longer (eleven years) than, though perhaps not as intensive as, Weaks' experience. For example, most recently Keel served two years as a District Supervisor, during which time he managed the emissions program in seven counties and which required "extensive knowledge of the emissions program." (Doc. 20-2, Blake Aff. ¶¶ 9-10.) He was required to know each position's duties (including those related to the emissions) to be able to provide the expertise to subordinates. (Doc. 28-2, Ex. E.) This experience expanded to nine more counties for four months, when he temporarily took responsibility for an adjoining district. (Id. ¶ 9.) He also had nine years' experience as Supervisor (Captain) of the Training and Development Section of the License and Theft Bureau (a position senior to that held by Weaks), which required that he be involved in and knowledgeable about emissions training. (Id. ¶ 10, King Aff. ¶ 5; Doc. 28-1, Coltrane Aff. ¶ 8.)

Weaks states summarily that the job posting for Assistant Director-Emissions on its face "clearly indicated and stressed the importance of knowledge of emissions." (Doc. 24, Weaks Decl. ¶ 19.) However, the posting states that "Management *prefers* knowledge &/or experience with a safety/emissions program." (Doc. 20-3, Ex. A (emphasis added); Doc. 25, Ex. A (same).) As in Diamond, a criterion that is "preferred" but not required is not essential and, therefore, not intended to be

dispositive.  While emission knowledge plainly is relevant to the position, an employee "cannot establish [his] own criteria for judging [his] qualifications for the promotion.  [He] must compete for the promotion based on the qualifications established by [his] employer."  <u>Anderson</u>, 406 F.3d at 269.  Thus, in rebutting Defendants' reliance on job qualifications, Weaks cannot simply compare himself to another employee on the basis of a self-selected evaluative factor "artificially severed from the employer's focus on multiple factors in combination."  <u>Hux</u>, 451 F.3d at 315.

Here, Defendants have set forth their criteria for the job in the posting, and Weaks has not proffered any evidence that they were a sham.[17]  In addition to a preference for emissions knowledge, those criteria included law enforcement, supervisory, and management experience.  (Doc. 25.)  As noted in more detail in the previous discussion as to Defendants' articulation of a nondiscriminatory reason, at the time of applications for the position of Assistant Director-Emissions in September 2008 Keel not only had substantial emissions knowledge, he had been a sworn law enforcement officer for over twenty-five years, had formally supervised employees for seventeen years, and had been designated Manager (formerly Captain) of programs and Districts

---

[17]  Weaks does attack the application of those job duties by the interview committee in the questionnaire, which is addressed <u>infra</u>.

for more than a decade. He was also certified as a Public Manager. By contrast, Weaks had been employed in the lower position of Law Enforcement Supervisor (Lieutenant) for just over two years. Prior to that time, he had served in line positions as a Vehicle Enforcement Officer, a Motor Carrier Officer, and, from April 2003 until his promotion to Supervisor in 2006, a Law Enforcement Agent/Inspector. At the time of his application, Weaks had not been a Manager (Captain) of any program within the License and Theft Bureau.

Both Weaks and Keel were indisputably qualified for the position of Assistant Director-Emissions. As noted by interview panelist Blake, while "[t]he application of Michael Weaks also reflects a progression of increasingly responsible positions with the License and Theft Bureau, however, his progression is not as long as Mr. Keel's, and his level of responsibility was not as high, and his positions were of a lower level." (Doc. 20-2, Blake Aff. ¶ 14.)

Weaks also argues that "questions 2-10 of the interview focus almost entirely on issues pertaining to supervision." (Doc. 23 at 14.) He contends that "[t]here are only three (3) questions specific to the position of Emissions." (Id.) This, Weaks surmises, required or permitted the interview panel to make subjective evaluations to suit a racial motive.

To the extent Weaks suggests that supervisory experience is not a bona fide criteria, or that an employer cannot consider subjective criteria, his argument fails. See Amirmokri v. Baltimore Gas & Electric Co., 60 F.3d 1126, 1130 (4th Cir. 1995) (noting that "[e]ven if [the plaintiff's] education and outside experience were objectively superior to [the other candidate's], [the employer] could properly take into account both the objective factor of [the other candidate's] outstanding performance . . . and the more subjective factors like his good interpersonal skills and his ability to lead a team"). Surely Defendants can consider a candidate's supervisory experience in seeking to fill a supervisory position.

Weaks also argues that the interview committee members could write anything they chose regardless of what the candidate stated in the interview, suggesting "[a] better method" would have the candidate write his or her own answers. (Doc. 23 at 15.) Of note, Weaks includes the interview sheet prepared by interview committee member Blake but points to no notation by him that did not match Weaks' interview answers. (See Doc. 24-2.) Further, Defendants observe that interviewers make contemporaneous notes prior to proceeding to the next question. DMV policy provides that interview notes are to be taken in pen, not pencil, with no use of correction tape or white-out. (Doc. 28-1, Coltrane Aff. ¶ 15; Doc. 28-4, Ex. G ("DMV Policy

Recruitment and Selection: Interview Panels" (July 30, 2009)).)
Needless to say, the court declines Weaks' urging to micromanage
Defendants' interview process.[18]

In summary, even assuming that Weaks had more emissions
knowledge and experience, he has failed to demonstrate
sufficient evidence from which a jury could conclude that he was
the better qualified candidate. Defendants were "entitled to
focus on the applicants' qualifications taken as a whole – a
judgment not rendered pretextual by the fact that one among many
factors is allegedly in dispute." Hux, 451 F.3d at 319. "The
crucial issue in a Title VII action is an unlawfully
discriminatory motive for a defendant's conduct, not the wisdom
or folly of its business judgment." Id. (quoting Jiminez v.
Mary Washington Coll., 57 F.3d 369 (4th Cir. 1995)). As is oft-
stated, this court "does not sit as a kind of super-personnel
department weighing the prudence of employment decisions made by
firms charged with employment discrimination." DeJarnette v.
Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal
quotation marks omitted). Thus, Weaks has failed to demonstrate
sufficient evidence of pretext on this basis.

---

[18] Weaks references "the disparate impact theory" in his discussion of
the nature of the interview questions and the manner in which the
answers were recorded. (Doc. 23 at 15.) Weaks does not provide or
forecast evidence in support of his "conten[tion] that the interview
panel's method had a disparate impact on him in this instance." (Id.)

### b.   Circumstantial Evidence Alleged to Undermine Defendants' Articulated Reason

Weaks presents circumstantial evidence in addition to his claim that he was the better-qualified candidate.  This evidence relates to his allegations regarding: (1) improper inclusion of Blake on the interview committee; (2) lack of interview committee member emissions expertise; (3) pre-selection of Keel; (4) improper promotion of Keel in light of the Defendants' policy regarding employees supervising or holding positions which could influence the employment of a family member; (5) disparate treatment following Weaks' 2006 promotion; and (6) statistical evidence of discrimination.   (Doc. 23 at 10-15.) Each is addressed in turn.

### i.   Inclusion of Blake on the Interview Committee

Weaks asserts that Blake's inclusion on the interview committee violated a DMV policy that committee members must have an equal or a higher rank than that of the position for which interviews are conducted.  (Doc. 23 at 13; Doc. 24, Weaks Decl. ¶ 16.)  Weaks claims that Defendants deviated from their promotion practices by including Blake in the interview committee.  "Deviation from regular procedures is a classic example of evidence used to show pretext."  Johnson v. City of Charlotte, 229 F. Supp. 2d 488, 495 (W.D.N.C. 2002) (citing Vaughan v. Metrahealth, 145 F.3d 197 (4th Cir. 1998), abrogation

on other grounds recognized by <u>Leake v. Ryan's Family</u> <u>Steakhouse</u>, 5 F. App'x 228, 232 (4th Cir. 2001)).

Weaks does not cite or provide a copy of the portion of any DMV policy which sets out the alleged DMV mandate requiring each panel member to hold an equal or higher rank than that of the position for which the interviews were conducted (in this case, the rank of Major or above). DMV Deputy Director for Personnel and Administration Jack D. Coltrane, who has been employed in DMV's License and Theft Bureau since 1985, stated on personal knowledge that "the License and Theft Bureau has never had a policy that the interview panel members 'would have equal or a higher rank than that of the position for which the interviews were being conducted.'" (Doc. 28-1, Coltrane Aff. ¶ 11.)

DMV's official policy is in accord with Coltrane's affidavit, as expressed in "DMV Policy Recruitment and Selection: Interview Panels." (<u>Id.</u> ¶¶ 11, 12; Doc. 28-4, Ex. G.)[19] According to DMV policy, job interviews are conducted by three panel members chosen from a list of supervisory and managerial staff approved to conduct interviews. A panel consists of a chairperson and two additional members. The

---

[19] The DMV Policy presented to the court is dated 2009, the year after the selection of Keel to the position of Assistant Director-Emissions. Defendants assert through affidavit that the policy "mirrors" that in effect at the time the interview panel was created. (Doc. 28-1, Coltrane Aff. ¶ 12; Doc. 28-4, Ex. G.) Weaks also presents an excerpt from a 2009 document relating to the selection process. (Doc. 27, Ex. E (Revised 2/10/09).)

chairperson "will be a supervisor or manager of the position for which interviews are being held and will serve as the 'technical expert' for the area to which the position is assigned." (Doc. 28-4, Ex. G.)

DMV's official policy also provides that "[t]wo (2) additional panel members will be selected from other sections within DMV." (Id.) The court has not located a provision of the DMV policy that the additional panel members must hold a rank at or above that of the interview position, and Weaks has not directed the court to any such provision. Weaks' unsupported assertion, particularly in the face of DMV's official policy on selecting interview committee members, cannot create a genuine dispute of material fact with respect to Blake's eligibility to serve on the interview committee. Further, Weaks has presented no evidence that even if such a policy existed, Blake's inclusion on the panel is evidence of pretext or disparate treatment. Rather, the inclusion of Blake, who is African-American, was in accord with DMV policy that "[t]o the fullest extent possible, DMV interview panels will represent diversity of race" and other characteristics.[20] (Id.)

---

[20] Indeed, the expected assertion would be just the opposite: that in lieu of someone on a hiring panel who was the same race or gender as a plaintiff, the employer placed someone of lesser qualifications who was not. In his briefing, Weaks fails to identify anyone of his race who he contends should have been included on the panel in lieu of Blake.

### ii. Alleged Lack of Interview Panel Emissions Expertise

Weaks challenges the credentials of panel members with respect to emissions experience, claiming that Blake had little experience and the other two members had none. (Doc. 23 at 13.) Weaks further states that "I believe the only reason Blake was selected for the interview panel is because of his race, since he lacked the knowledge and understanding of emissions to make a sound decision for the position and DMV wanted to have diversity on the panel." (Doc. 24, Weaks Aff. ¶ 17.)

By virtue of their positions, however, all three panel members administered or oversaw the Emissions Program for their respective areas of responsibility.[21] (Doc. 28-1, Coltrane Aff. ¶ 13.) As noted above, DMV policy applicable generally to interview committees designated the chairperson as the "technical expert" and required that the chairperson be the supervisor or manager of the position for which the interview is conducted. As the designated technical expert, the chairperson is tasked with providing necessary information to the two additional panel members. (Doc. 28-4, Ex. G.) In other words, DMV Policy contemplates that some committee members will

---

[21] Blake was District Supervisor and administered the License and Theft Bureau's Emissions Program in nine counties, while Deputy Director Lockamy and Director Bozard oversaw the entire License and Theft Bureau, including the Emissions Program. (E.g., Doc. 28-1, Coltrane Aff. ¶ 14; see Doc. 28-2, Ex. E.)

initially have little or no expertise in certain areas relevant to the job position. Weaks has not provided or forecast evidence indicating that the procedure followed was not in accord with the Defendants' policy with respect to information relating to the position of Assistant Director-Emissions.

A policy which designates the supervisor or manager of the open position as the "technical expert" and provides that such supervisor or manager will provide necessary information to the other panel members does not evidence a design to disadvantage any candidate based on race. Weaks' statements regarding an alleged lack of expertise on the part of the panel members does not raise a genuine dispute of material fact sufficient to evidence pretext.

### iii. Pre-Selection Rumor

Weaks asserts that there were rumors that Keel had been pre-selected to be Assistant Director-Emissions. (Doc. 23 at 13; Doc. 24, Weaks Decl. ¶ 18.) Rumors, however, are prototypical examples of inadmissible hearsay. See Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995) (holding that unattributed rumors are inadmissible hearsay; such evidence is neither admissible at trial nor supportive of an opposition to a motion for summary judgment). Further, rumors "are wholly insufficient evidence to establish a claim of discrimination as a matter of law."

Mbadiwe v. Union Mem'l Reg'l Med. Ctr., Inc., No. 3:05CV49-MU,
2007 WL 1219953, at *2 (W.D.N.C. Apr. 24, 2007) (quoting
Mitchell v. Toledo Hosp., 964 F.2d 577, 585 (6th Cir. 1992)),
aff'd, 265 F. App'x 147 (4th Cir. 2008) (per curiam).

Even so, pre-selection does not violate Title VII when the
pre-selection is based on the qualifications of the pre-selected
candidate, and not on some basis prohibited by Title VII.  See
Mackey v. Shalala, 360 F.3d 463, 468-69 (4th Cir. 2004) (citing
Kennedy v. Landon, 598 F.2d 337, 341 (4th Cir. 1979)); see also
Moore v. Mukasey, 395 F. App'x 111, 117 (4th Cir. 2008)
("Although the pre-selection of [one candidate] may have
violated the rules and regulations of [the employer], it does
not evidence the type of discrimination that is prohibited by
Title VII." (quoting Kennedy, 598 F.2d at 341)).  In addition,
the Fourth Circuit has stated that "[t]he argument that a
supervisor may have preselected an employee for a promotion 'is
not sufficient evidence for jurors reasonably to conclude' that
the Defendant's explanation for hiring [another candidate] was
pretext" when based on qualifications not prohibited by Title
VII.  Anderson, 406 F.3d at 271 (quoting Mackey, 360 F.3d at
468-69).  "If one employee was unfairly preselected for the
position, the preselection would work to the detriment of all
applicants for the job, black and white alike."  Anderson, 406
F.3d at 271 (quoting Blue v. U.S. Dep't of the Army, 914 F.2d

525, 541 (4th Cir. 1990)).  Thus, while pre-selection may establish that an employee was "unfairly treated, it does not by itself prove racial discrimination."  <u>Anderson</u>, 406 F.3d at 271 (quoting <u>Blue</u>, 914 F.2d at 541).

Regardless of whether pre-selection might be relevant in the presence of other evidence of discrimination, in this case Weaks offers only a "rumor" of pre-selection and, after the close of discovery, forecasts no admissible evidence that pre-selection occurred.  Thus, he fails to raise a genuine dispute of material fact sufficient to support a pretext challenge or to show disparate treatment.

### iv. DMV Policy Regarding Supervision of Employee by Family Member Employee

Weaks asserts that Keel should not have been promoted to Assistant Director-Emissions because, according to the Office of State Personnel/DMV policy, "members of an immediate family shall not be employed within the same Agency if such employment will result in one member supervising another member of the employee's immediate family" or if one family member will occupy a position that has influence over the other member's employment.  (Doc. 23 at 12-13; <u>see</u> Doc. 24, Weaks Decl. ¶ 15.) Presumably, his point is that this is evidence that Defendants sought to promote, or not to promote, based on race even in the

face of an anti-nepotism policy.  Weaks does not provide a copy of or quote from the DMV policy in question.

Defendants, through DMV License and Theft Bureau Deputy Director for Personnel and Administration Coltrane, assert that Keel was not married to an emissions employee at the time of his application and promotion and, when he subsequently married an emissions auditor in District III, a position which he did not supervise, the License and Theft Bureau believed "it would be better if his wife found a new position within the Agency. However, before this happened, Keel announced his retirement and has since retired from state employment."  (Doc. 28-1, Coltrane Aff. ¶ 10.)  Importantly, this statement agrees with Keel's application for the position at issue, in which he discloses that his *ex-wife* was a DMV Examiner.  (Doc. 27-1, Ex. F (noting "X-wife" and bearing a name different from that of the alleged wife).)  On its face, the application discloses no then-current spouse (or other relation) working for the State of North Carolina.  (Id.)  Thus, the information before the interview committee did not implicate DMV policy, even as alleged by Weaks.[22]

---

[22]  Nepotism may in some cases violate Title VII under a "disparate impact" theory, a theory referenced in Weaks' filings only with respect to the interview questions asked and the method of writing down a candidate's answers (see Doc. 23 at 15), claims addressed above.  See Holder v. City of Raleigh, 867 F.2d 823, 825-26 (4th Cir. 1989).  Here, Weaks does not allege nepotism in the selection of Keel as Assistant Director-Emissions.  That is, Weaks does not allege that

Weaks provides no evidence other than a conclusory statement that DMV policy should have prevented Keel's promotion. He also has not tied any alleged DMV policy violation to discriminatory conduct. Therefore, he does not raise a genuine dispute of material fact sufficient to support a pretext challenge or to show disparate treatment based on an alleged relationship between Keel and a family-member employee.

### v. Disparate Treatment Following Weaks' Promotion to Supervisor

Although Weaks focuses his briefing and declaration on Defendants' failure to promote him to Assistant Director-Emissions, his complaint alleges disparate treatment beginning in 2006. Weaks contends that "after being promoted to the position of supervisor in 2006, he was treated differently than non-minority, similarly situated supervisors . . . [and] contends that among other things, he was not provided the support, authority, promotional opportunities, privileges and work environment as the non-minority supervisors due to his race." (Doc. 1, Cmplt. ¶ VIII.) He states generally that he "was regularly excluded from important business meetings, not involved in the decisionmaking process, and [his] subordinates were allowed to go over [his] head to discuss matters over which

one employee's position in DMV brought about the promotion of another family member or friend to Assistant Director-Emissions. Rather, Weaks asserts that the promotion of Keel itself violated DMV policy.

[he] was in charge."  (Doc. 24, Weaks Decl. ¶ 13.)  He complained to "Keel about these matters and he responded that he was told to exclude me from 'some things.'"  (Id.)

Defendants urge as "noteworthy" the fact that Weaks' supervisor in 2006 was Gordon Ziegler, an African-American, and that the Director of the License and Theft Bureau, John Robinson, was also African-American.  (Doc. 20 at 10; Doc. 20-2, Blake Aff. ¶ 24, Gardner Aff. ¶ 2.)  Defendants contend that Weaks' claims lack merit because his immediate supervisor and ultimate boss were African-Americans, like him.  Weaks replies only that at the time of his application for the position of Assistant Director-Emissions (i.e., September 2008), Gordon Zieglar was not the Director of the License and Theft Bureau and John Robinson had retired.  (Doc. 24, Weaks Decl. ¶ 11.)

The existence of some adverse employment action is required to state a claim regardless of the route a plaintiff follows in a Title VII action.  James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004).  An adverse employment action is a discriminatory act which "adversely affect[s] 'the terms, conditions, or benefits' of the plaintiff's employment."  Id. While "[c]onduct short of ultimate employment decisions can constitute adverse employment action," id. at 375-76 (quoting Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001), abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.

v. White, 548 U.S. 53 (2006)) (internal quotation marks omitted), the "typical requirements for a showing of an 'adverse employment action'" are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion," Boone v. Goldin, 178 F.3d 253, 255 (4th Cir. 1999).  For example, the Fourth Circuit has held that a reassignment only constitutes an "adverse employment action" if the reassignment has a "significant detrimental effect" on the plaintiff.  Id. at 256.

Weaks' assertions of generalized conduct prior to the promotion decision do not rise to the level of an adverse employment action.  Further, he forecasts no evidence sufficient for a trier of fact to find in his favor.  To the extent Weaks offers his allegations of disparate treatment since 2006 as evidence to support his failure to promote claim, their cumulative effect with other circumstantial evidence falls short of that sufficient from which a jury could find that Defendants' articulated reason for not promoting him was false.

### vi.  Anecdotal & Statistical Evidence

Finally, Weaks asserts that he has produced "evidence that the Defendant had a pattern and practice of disparate treatment toward black employees."  (Doc. 23 at 10.)  Specifically, he claims that "DMV has a history of promoting white employees over blacks at a much faster pace," listing "for example" nine

employees who were "promoted to high ranking positions since 2005" and states that blacks and other minorities "were frequently denied an interview and rejected for positions for which they applied," listing three individuals as examples. (Doc. 24, Weaks Decl. ¶¶ 20-21.) Weaks also claims that though there were ten promotions to "upper management" at the Defendants' Raleigh Headquarters within an unspecified nine-month period, none involved black employees. (Id. ¶ 22.)[23]

In disparate treatment cases, statistical evidence is "unquestionably relevant." Carter, 33 F.3d at 456. It may be used to show that an employer's stated nondiscriminatory reason is nothing more than a pretext. However, the Fourth Circuit's "broad pronouncement that statistical evidence is 'unquestionably relevant' in a Title VII case cannot be read to foreclose the exclusion of evidence with little or no probative value." Id. "In a case of discrimination in hiring or promoting, the relevant comparison is between the percentage of

---

[23] Defendants request that the court "strike and disregard" a number of statements in Weaks' Declaration, including those relating to these figures, primarily on the ground that he lacks personal knowledge and/or that his statements are conclusory. (Doc. 28 at 4.) While portions of Weaks' declaration appear conclusory, because Weaks' claim ultimately fails the court will assume, without deciding, that Weaks' employment with Defendants put him in a position to have personal knowledge of the promotions and circumstances at DMV to the extent he has stated. Cf. Bond v. Health Sys. Grp. First Data Corp., Case No. 3:96CV418-P, 1998 U.S. Dist. LEXIS 6391, at *14-*16 (W.D.N.C. 1998) (striking portions of employee's affidavit not shown to be based on personal knowledge).

minority employees and the percentage of potential minority applicants in the qualified labor pool." Id. Further, depending on the type of statistical evidence proffered, expert testimony as to methodology or relevance to a plaintiff's claim may be necessary to avoid exclusion. Id.

In Carter, the Fourth Circuit held that statistical evidence that none of the employer's thirty managerial positions was held by African-Americans was properly excluded from consideration at trial because the plaintiff-employee presented no supporting evidence relating to the pool of African-Americans qualified for those positions. Id. at 456-57. The Fourth Circuit reasoned that the absence of minority employees in upper-level positions was insufficient to prove discrimination absent a comparison with the relevant labor pool for those positions. Id. at 456. The court specifically rejected the plaintiff's arguments that (1) the presence of African-Americans in the relevant pool could be inferred from the plaintiff's own qualifications and (2) the total lack of African-American management, the "inexorable zero," constituted proof of discriminatory motive. Id. at 457.[24]

---

[24] Although Carter addressed the district court's decision to exclude the statistical data in question, the language has been applied in the summary judgment context. E.g., Luh v. J.M. Huber Corp., 211 F. App'x 143, 149 (4th Cir. 2006); Diamond v. Bea Maurer, Inc., 128 F. App'x 968, 971 (4th Cir. 2005); Mills v. N.C. Dep't of Transp., No. 5:06-CV-97-F, 2007 WL 2461634, at *1 (E.D.N.C. Aug. 24, 2007), aff'd, 283 F. App'x 169 (4th Cir. 2008) (per curiam).

In the instant case, Weaks provides the names, titles and (in some cases) limited other information regarding nine white employees allegedly promoted "since 2005" as well as for three "black and other minority employees" who were not. (Doc. 24, Weaks Aff. ¶¶ 20-21.) He provides no facts regarding the qualified labor pool. See Lowery v. Circuit City Stores, Inc., 158 F.3d 742, 764 (4th Cir. 1998) (rejecting statistical study because it failed to control for factors other than race that could account for disparity in promotions), vacated and remanded in part on other grounds, 527 U.S. 1031 (1999). The importance of this omission is underscored by the fact that the License and Theft Bureau alone employs between 292 and 502 individuals. (Compare Doc. 25-1 at 2 with Doc. 28-3 at 3; see Doc. 1, Cmplt. ¶ IV (NCDOT employs over 14,000 persons).) Nor does he represent that these are the only employees, white or black (or other minority), who were promoted or denied promotions since 2005. So, the court is unable to determine that this anecdotal recitation of employment actions by itself is probative of any discriminatory treatment. Moreover, his claim of a "nine month period" during which no black employee was promoted to "upper management" while ten others were is not defined at all either as to what constitutes "upper management" or as to time to indicate what connection, if any, it has with the timeframe of Weaks' claim. It also suffers from a lack of articulation as to

the race of those who were allegedly promoted and as to the qualified labor pool. Finally, as to his claim that blacks were promoted at a slower "pace," Weaks fails to provide any meaningful comparators from which a jury could infer such a conclusion.

Even assuming that Weaks' representations are based on a proper foundation, this anecdotal/statistical evidence is similar to that considered in Carter. These representations are ambiguous, generalized, and nonspecific, thus failing to provide a basis from which any conclusions sufficient to withstand summary judgment can be drawn.

This is not to say, however, that anecdotal or statistical evidence cannot be considered in the presence of other admissible evidence, such as an employer's inconsistent justifications for its action. In such cases, the cumulative effect may be sufficient to create a jury question with respect to the alleged discrimination. See, e.g., Wright v. N.C. Dep't of Health & Human Services, 405 F. Supp. 2d 631 (E.D.N.C. 2005); Jordan v. Shaw Indus., Inc., Case Nos. 6:93CV542, 6:93CV543, 6:93CV544, 6:93CV545, 1996 WL 1061687 (M.D.N.C. Aug. 13, 1996). Here, Weaks' anecdotal information cannot save his claims because he lacks sufficient other evidence with which it could be considered cumulatively to undermine the credibility of

Defendants' articulated reason for not promoting him to Assistant Director-Emissions.

### D.    Summary

Weaks, by virtue of his record and experience, was qualified to hold the position of Assistant Director-Emissions, as Defendants admit. But so was Keel. Viewing the record as a whole in the light most favorable to him, Weaks has failed to demonstrate a genuine dispute of material fact that Defendants' nondiscriminatory reasons for selecting Keel were pretext. That is, considering all the job requirements, Weaks has failed to present or forecast sufficient evidence from which a jury could find that he was more qualified or that Defendants' asserted justification is false.

## III. CONCLUSION

For the reasons set forth above, the court finds no genuine dispute of material fact as to Weaks' claims, and Defendants are entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED that Defendants' motion for summary judgment (Doc. 19) is GRANTED and that this matter be, and hereby is, DISMISSED WITH PREJUDICE.

A separate Judgment will be entered.


                                    /s/    Thomas D. Schroeder
                                  United State District Judge
January 25, 2011